IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2017

## DAVID DWIGHT HESTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
No. 18026PC        Franklin L. Russell, Judge
_____

### No. M2016-01351-CCA-R3-PC
_____

Petitioner, David Dwight Hester, pleaded guilty to initiation of methamphetamine manufacture, and two counts of aggravated child neglect. He received an agreed effective sentence of twenty-five years at thirty percent as a Range I offender. Petitioner subsequently filed a post-conviction petition that was denied by the post-conviction court. On appeal, Petitioner argues that trial counsel was ineffective for failing to challenge the indictments charging him with aggravated child abuse or neglect because each indictment charged him with "two distinct offenses." He also argues that trial counsel told him that he was required to receive the same sentence as his co-defendant and that Petitioner risked serving his sentence at one-hundred percent eligibility if the case went to trial. After thoroughly reviewing the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROBERT L. HOLLOWAY, JR., JJ., joined.

M. Wesley Hall, IV, Unionville, Tennessee, for the appellant, David Dwight Hester.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Robert James Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Guilty Plea Submission Hearings*

On August 16, 2013, Petitioner pleaded guilty to initiation of methamphetamine manufacture and two counts of aggravated child neglect. Pursuant to the plea agreement, the trial court imposed an effective fifteen-year sentence at one-hundred percent. Based

upon an error in the assignment of an eligibility percentage of one-hundred percent, Petitioner was allowed, with the agreement of the State, to withdraw his guilty pleas. Before Petitioner's trial began, Petitioner asked to enter into an open plea to initiation of methamphetamine manufacture and two counts of aggravated child neglect in exchange for dismissal of the remaining charges. The State and Petitioner entered a plea agreement prior to the sentencing hearing that included a twelve-year sentence for initiation of methamphetamine manufacture, a Class B felony; a twelve-year sentence for one count of aggravated child neglect, a Class B felony; and a twenty-five year sentence for the second count of aggravated child neglect, a Class A felony. The counts were ordered to run concurrently for an effective twenty-five-year sentence at thirty percent.

At the second guilty plea submission hearing, the State set forth the following facts of the offenses:

> The factual basis occurred on the night of December 18th and the early morning hours of December 19, 2012. What happened is during the evening hours of the 18th dispatch sent out a call of a suspicious person at Walgreens up here on, of course, north Main. Several county officers, Corporal Burris, Sergeant Tolar, were the first to respond, and they were told that an individual was there basically soliciting other customers to purchase a box containing pseudoephedrine on, on his behalf.
>
> The deputies got there. They actually observed a customer handing a, a Walgreens bag to this individual. So, apparently, this individual was successful in getting another customer to purchase pseudoephedrine for him. They then stopped that individual and a lady that he was with.
>
> Those individuals turned out to be James Floyd Thomas and Brenda Points. They were interviewed and admitted that they were there acquiring, acquiring pseudoephedrine, that they were going to take the box back to an apartment on Madison Street where several individuals were cooking methamphetamine. And so, they were going to take that box and have it converted to methamphetamine.
>
> They named some names including specifically an individual named David and a girl named Kayla. The task force, drug task force, was then contacted. They did some follow-up interviewing of Mr. Thomas and Ms. Points. They decided to let them attempt a controlled delivery of the box of Sudafed to someone at the apartment and see where that investigation might lead them.
>
> So, they set up surveillance on the apartment, but before a controlled delivery could be conducted, they observed the defendant, Kayla

- 2 -

Howell, and two small children coming out of the apartment. The defendant was carrying a white jug and a plastic bag. They all got in a silver Monte Carlo car and drove away. I should say by now it's past midnight, so we're now into the morning hours of the 19th.

The - - Assistant Director Miller and a couple of deputies followed the car until it stopped at a residence on Warner Bridge, Warner Bridge Road. That was Kayla Howell's father's residence. They then made contact with the defendant, who was the driver. They patted him down. They found in his coat pocket a bottle of drain cleaner, which, of course, is another component of meth manufacture. They also found some finished meth in his possession. That was sent to the lab and weighed .43 grams. They found some digital scales on his person and some black tape.

In the car, they found the white jug, which was an empty jug of muriatic acid, which, of course, is another component of meth manufacture, and they found a plastic bag which had a, a bottle in it, which had obviously been a recent meth cook, the shake-and-bake method. And, of course, this, this was found in the floorboard where Kayla was sitting. This, of course, was the car that the two children had just been riding in.

The children were [B.M.], who was age 12 at the time, and [R.H.], who was age 7 at the time. The children were allowed to go on to the house. The, the, there was a room in the house that was also searched. They found at least one empty box of pseudoephedrine. They found plastic tubing - - or I should say in the plastic bag that the defendant was carrying that had the old meth cook. They also found another, a gasser tube with the, the cap had the hole drilled into it, the tube had been inserted it [sic], and wrapped with black tape. They found more tubing in the bedroom. They found a plate that had meth residue, which appeared as though it had been snorted off of it. They found a set of silver scales and other paraphernalia associated with using and or producing meth. They found aluminum foil, they found coffee filters, they found the little mask that you might wear over your face when you're around noxious chemicals or, say, doing paint, something like that.

The defendant was, and Kayla, were both interviewed. They admitted that they had been at that apartment just earlier in the evening, they had cooked meth, that the children had been there during that process. The defendant also admitted that he sometimes sold small quan[ti]ties of

- 3 -

meth in order to pay expenses or to get money to acquire more supplies to cook meth with.

Officers then went back to the apartment, they conducted a search of that. They found a huge volume of meth-related products. They found Coleman fuel, other components, they - - just about everything associated with the meth manufacture process and the consumption of meth.

The, the defendant was interviewed two other times, once by a DCS worker, Amanda Burke, and by Detective Chad Webster of the Bedford County Sheriff's Department. During the course of these interviews, the, the defendant admitted that he had been using meth for a period of time, perhaps between a month and a half, two months, he had been making meth for approximately a month, he had made meth that night at the apartment.

He admitted that the children would have observed part of this process including him shaking the bottle. He did part of the process inside, he did part of the process outside. He came back in to complete the process including the gassing-off process, which he said took place in the bathroom. And then there was a second gassing off and it was either in the bathroom or in the kitchen. The children would have been present in the residence when this happened.

Kayla Howell was interviewed, and I can tell you I've interviewed her in preparation for the trial and she says that the, the children would have, that, would have been exposed to different steps of the process, the shaking of the bottle, the gassing off in the bathroom, their removing of the material, the, the, also, the, the, both snorting of it and the smoking of it they would have observed.

I have interviewed both children. They're both prepared to testify that they observed the defendant measuring out the chemicals and components that go into the cook. They observed him go outside, they observed him come back inside. They observed him shaking the bottle. They observed the gassing-off process in the bathroom. They observed some of this going on in the kitchen.

[B.M.] says she would have been about a distance from me to this podium, which I would say is four to five feet, at one point during that process. The gasser tube and bottle, she actually went to the bathroom after that process was over and was with, within arm's reach of that.

- 4 -

[R.H.] says she saw David, the defendant, and other adults shaking the bottle. She saw them lighting - - both children say they saw the adults lighting aluminum foil, and that's one of the methods of ingesting it is they make an aluminum foil boat. Both children say they saw that. [B.M.] says she saw the adults, including her mother, snorting meth and saw other adults both snorting and smoking meth.

They - - now, part of that time the children were in the bedroom, the door was closed, and there was a towel across the door. The, and, and the door of the bathroom would have been closed part of that time, but - - so, it wasn't the entire process they were exposed to, but it was different points in time.

Both children said that different adults during the night told them when they were observing these things that the adults were making bombs. And both children have told the investigators who have investigated this, the detective, the DCS worker, even Assistant Director Miller interviewed one of the children, they've been consistent in telling about that. They were consistent in telling me about that.

Upon questioning by the trial court, Petitioner agreed with the facts presented by the State. He also indicated that he did not have any health problems that would affect his ability to understand the guilty plea process, and he had not ingested any drugs or alcohol that would affect his thinking in any way. Petitioner also stated that he was able to read and write. Petitioner told the trial court that he had read the plea agreement and signed it. He also reviewed the document with trial counsel and asked questions about the plea agreement. Petitioner did not have any other questions about the plea agreement when asked by the trial court and said that he understood everything in his petition to enter a guilty plea. He stated that he and trial counsel discussed the charges against him, and counsel explained potential punishment. The trial court also reviewed the five charges against Petitioner and the potential punishment for each count.

Petitioner told the trial court that his guilty plea was "free and voluntary" and that he had not been threatened in any way or promised anything in exchange for his plea. He did not have any complaints about the way and manner in which he was represented by trial counsel. Petitioner told the trial court that he did not have any questions about anything discussed during the guilty plea hearing. At the hearing, the trial court again questioned Petitioner about the plea agreement, reminding him of his right to a sentencing hearing. Petitioner said that he wished to waive the hearing and accept the plea agreement. He also said that no one forced him to accept the agreement.

- 5 -

*Post-Conviction Hearing*

Trial counsel testified that he began representing Petitioner after Petitioner's first guilty pleas were withdrawn. He reviewed the indictments and noted that Petitioner was charged with aggravated child abuse or neglect regarding two children that were in the household. When asked if trial counsel saw any issues with the indictments charging aggravated child abuse or neglect, trial counsel replied: "That's the style of the statute. That's the plain reading and the plain heading of the statute. I didn't see [an] issue with that."

On cross-examination, trial counsel testified that after Petitioner's first guilty pleas were withdrawn, trial counsel began attempts to negotiate another settlement with the State. The prosecutor was agreeable to a sentence that "would get [Petitioner] about the same amount of time as the original sentence of [fifteen] years at one hundred percent[.]" Trial counsel testified that Petitioner rejected the State's final offer, and his case was set for trial. At some point on the day of the trial, Petitioner asked trial counsel whether he could obtain a plea agreement that was close to the "[thirty] percent offer that we were originally talking about." Petitioner also wanted certain counts of the indictment dismissed. Petitioner ended up pleading guilty to initiation of methamphetamine manufacture and two counts of aggravated child neglect with the trial court to determine the sentences. The charges against Petitioner for possession of a Schedule II controlled substance for resale and possession of a Schedule II controlled substance for delivery were nollied by the State. On the day of Petitioner's sentencing hearing another agreement was reached: an effective sentence of twenty-five years at thirty percent release eligibility. Trial counsel admitted that the agreement was better than the State's offer before the trial was set. Trial counsel testified: "Yeah, it was much better than a [fifteen-]year total, you know, that's where we were at. You [prosecutor] wanted something that was [fifteen] years once we did all the math back and forth. It worked out a lot better."

Trial counsel felt that Petitioner was "adequately informed" of what he was doing at the time of the guilty plea, and he noted that it was Petitioner's second time to plead guilty in the case. He said that Petitioner "[d]efinitely" made an informed, voluntary decision to plead guilty. Trial counsel testified that he could not remember if the indictment alleged more than one theory but he said that he did not have any problems with the indictment. He said, "It, the indictment was rather long and in a nutshell, it was, they were cooking and the kids were present, and the ages of the children." Trial counsel testified that if the indictment had alleged more than one theory in a single count, he would have addressed it with the trial court.

During both direct examination and cross-examination, trial counsel testified that the State was proceeding on a theory of aggravated child abuse rather than aggravated child neglect.

On redirect examination, trial counsel testified that he was aware that Petitioner's co-defendant had originally received the same sentence as Petitioner had received. When asked what he told Petitioner about Petitioner's sentence being the same as his co-defendant's, trial counsel testified:

> [S]pecifically, I don't - - well, what I would have told him is, he wanted, you know, the State wants a [fifteen]-year sentence, something that's going to be in effect close to [fifteen] years. That given my conversations with the [co-]defendant's attorney, not him, not the defendant here, but the co-defendant's attorney, it seemed like they were going to either be keeping the current sentence, well, actually it seemed like they were going to be keeping the current sentence. And my understanding from speaking with the DA would be they wanted something that would in effect be [fifteen] years. And I would have said something in essence of, if that's what the DA wants, if he wants to keep them the same, we can deal with that, with him, or [we] can go to trial.
>
> Now, it, I mean, he, pleading is the prerogative of first the State, and then, well, the defendant and the Court. I can't force, I can't force the State to give him a better offer.

According to Petitioner, the presentence report said that his co-defendant had been sentenced to fifteen years at one-hundred percent. Petitioner testified that trial counsel told him that he would receive the same sentence as his co-defendant. He said that he later looked on the Internet and discovered that his co-defendant had received a fifteen-year sentence at thirty percent.

Petitioner testified that his indictments were duplicitous because he was charged with two separate offenses in one count of the indictment. He said that aggravated child abuse is a separate offense from aggravated child neglect. Petitioner testified his legal argument on this issue is as follows:

> That, that, two charges under one count of the indictment, and it, duplicity covers double dealing, double pleading and stuff, that, that, I looked it up in a prior case in an appellate court in Nashville, where it was the same way, it was two charges like that on an indictment. And it says the judgment could not stand, because it was two charges under one count of the indictment.

Contrary to what trial counsel testified to his understanding of what charges the State was proceeding on, Petitioner testified during cross-examination that he pled guilty to two counts of aggravated child *neglect*. Petitioner agreed that trial counsel told him

that the State was "agreeable to the sentence at [thirty] percent, but they wanted it to work out where [he] basically [does] fifteen years in prison before [he] [makes] parole." Petitioner testified that he rejected the State's initial plea offer after his first guilty plea had been set aside and decided to go to trial. He was aware that his co-defendant and her two children would testify against him. Petitioner knew that the children would testify that they saw Petitioner making the methamphetamine, shaking the bottle, and that he told them he was making a bomb. Petitioner had also made a statement to Chad Webster admitting that he had been making methamphetamine.

Petitioner agreed that a release eligibility of thirty percent was important to him. He testified that he went to trial counsel after the jury had been impaneled for his trial, and they had a conversation about the guilty plea. The following exchange then took place at the post-conviction hearing:

> [Prosecutor]: And then, there was, did you ask [trial counsel] about if, Hey, look, I'll plead to these three charges, the two aggravated child neglects [sic] and the initiation charge, if the State will forget the rest of it and agree that it's at [thirty percent]?
>
> [Petitioner]: Yes, sir.

At the guilty plea acceptance hearing, the State then agreed that whatever effective sentence that Petitioner received at the sentencing hearing for the three charges, it would be served at thirty percent release eligibility. Petitioner testified that on the day of the sentencing hearing, he agreed to an effective twenty-five-year sentence at thirty percent release eligibility.

Concerning Petitioner's co-defendant's sentence, the following exchange took place at the post-conviction hearing:

> [Prosecutor]: And now, I heard you say that [trial counsel] told you something to the effect that you had to get the same thing that [co-defendant] Kayla Howell had?
>
> [Petitioner]: No, he just said that ya'll have to do us about the same way - -
>
> [Prosecutor]: About the same - -
>
> [Petitioner]: - - that she kept the [fifteen] at a hundred, so ya'll were going to give me something where I had to serve about [fifteen] years.

[Prosecutor]:     All right. Because it's fair to say when you agreed to that [twenty-five] at [thirty] percent, you actually at that point had a better deal than Kayla Howell?

[Petitioner]:     Yes, sir.

[Prosecutor]:     Because she still had [fifteen] years at a hundred percent?

[Petitioner]:     Yes, sir.

[Prosecutor]:     And I'm not very good at math, but [fifteen] years at a hundred percent is [fifteen] years. Well, I think you can get about [fifteen] percent off, so that's about [twelve] and a half years?

[Petitioner]:     Yes, sir.

[Prosecutor]:     [Thirty] percent at [twenty-five], that's actually better than she had?

[Petitioner]:     Yes, sir.

Petitioner did not feel that he received a better deal than his co-defendant "because [twenty-five] at [thirty], you go up for parole at seven and a half years. But it's not a guaranteed they'll release you on parole. I mean I could wind up doing the whole time in prison." He agreed that he would be eligible for parole at least five years before his co-defendant. Petitioner testified that he learned that his co-defendant's sentence was later modified to thirty percent release eligibility. Petitioner also testified that prior to his sentencing hearing trial counsel told him that he could still be sentenced at one-hundred percent despite the fact that on two occasions, the State had agreed that Petitioner had to be sentenced at thirty percent. Petitioner testified that he asked trial counsel to "do something" about the indictment, and trial counsel "chose not to do it."

On rebuttal, trial counsel testified that the only way he would have told Petitioner that he could be sentenced at one-hundred percent was if he and Petitioner had been talking about some kind of "weird hypothetical." Trial counsel also said, "But we'd already agreed to where we were at." Trial counsel also reiterated that the State was proceeding on the theory of guilt of aggravated child abuse and not aggravated child neglect.

*Analysis*

Petitioner contends that trial counsel "failed to competently represent [him] through various inadequacies" during the guilty plea process. More specifically he argues that trial counsel should have challenged the indictments charging him with aggravated child abuse or neglect because each indictment charged him with "two distinct offenses." He also argues that trial counsel told him that he was required to receive the same sentence as his co-defendant, Kayla Howell, and that Petitioner risked serving his sentence at one-hundred percent eligibility if the case went to trial. However, we find that the evidence does not preponderate against the trial court's finding that the petitioner received effective assistance of counsel.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is

satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

First, Petitioner contends that trial counsel "failed to get the indictment struck or at the very least specified as to which of the offenses he was indicted for. Child abuse and neglect are two distinct offenses that are defined separately. T.C.A. § 39-15-401(2016)." Concerning this issue, the post-conviction court stated in its written memorandum opinion concerning the order denying post-conviction relief:

> The Petitioner complained that [trial counsel] did not move to have Counts 4[] and 5[] of the indictment struck because they alleged both child *neglect* and child *abuse*. The argument is that it would be impossible to be certain of the unanimity of the jurors' verdict if there were two separate crimes charged in one count, the abuse and the neglect. It was clear, however, that the conduct leading to the charges was making meth in the presence of the children. The verdict forms had already been prepared by this judge, and those forms mentioned only one of the two versions of the statute. The time to address that issue would have been at the close of the State's proof, and if granted, one theory would have been dropped from the definition of the crime in the charge and only one theory would have been mentioned on the verdict forms. The failure to raise the issue pre-trial **did fall below the applicable standard**.

(italicized emphasis in original, bold print emphasis added).

We note that the trial court apparently meant to say did **not** fall below the applicable standard rather than "did fall below the applicable standard." The post-conviction court made its ruling from the bench, ruling in part: "All right. I will confess that there are some of the allegations that I just really struggled to understand exactly what they are, but my [final] conclusion is certainly that [trial counsel's] representation has not fallen before the, below the applicable standard for defense attorneys." Initially, as pointed out by the State, the record does not contain a copy of the indictment charging Petitioner with aggravated child abuse or neglect or copies of the judgments or guilty plea agreement. Thus, there is nothing in the record about the wording of the counts in the indictment other than the post-conviction court's findings and testimony of the witnesses.

At both guilty plea submission hearings, the trial court stated that Petitioner was pleading guilty to two counts of aggravated child neglect, to which Petitioner stated he understood that fact. The following exchange between the trial court and Petitioner took place at the second guilty plea submission hearing:

> Q.    Count [4] is aggravated child neglect. That's another "B" felony. Again, 8 to 30 years, up to a $25,000 fine, and with the same breakdown, that we had on the "B" felony in Count [3], in other words, 8 to 12, 12 to 20, 20 to 30. Okay. Do you understand that?
>
> A.    Yes, sir.
>
> Q.    And finally Count [5] is aggravated child neglect, and this version, because of the age of the child is a Class "A" felony. So, it carries a possible 15 to 60 years and up to a $50,000 fine. Those ranges, depending upon how many past felony convictions there are on your record, are 15 to 25, 25 to 40, and 40 to 60 years. Okay. You understand that?
>
> A.    Yes, sir.

Trial counsel testified that he could not remember if the indictment alleged more than one theory but he said that he did not have any problems with the indictment. He said, "It, the indictment was rather long and in a nutshell, it was, they were cooking and the kids were present, and the ages of the children." Trial counsel testified that if the indictment had alleged more than one theory in a single count, he would have addressed it with the trial court. Petitioner did not go to trial in this case, so there was no concern of verdict unanimity. Furthermore, if trial counsel had successfully convinced the court to dismiss the subject counts to the indictment pretrial, there can be no doubt, with the procedural history of this case which is set out in the record, that the State would have resubmitted the aggravated child neglect charges to the Grand Jury. Petitioner has not shown that he was prejudiced by any deficiency concerning this issue. Petitioner is not entitled to relief on this issue.

Next, Petitioner argues that trial counsel told him that "he had to receive the same sentence as his co-defendant" and that Petitioner "could possibly get sentence[ed] at 100% if he had a sentencing hearing." Concerning this issue the trial court held:

> The Petitioner at times in his testimony at the evidentiary hearing alleged that [trial counsel] told him his sentence had to be the same as the Co-defendant's sentence. At other times in his testimony the Petitioner admitted that [trial counsel] never told him that the law required equality of treatment of two co-defendants. The Petitioner knew better than that because his sentence was actually shorter than his Co-defendant's

sentence. It is found as a matter of fact that [trial counsel] made no such representation and that therefore his representation of the Defendant did not fall below the applicable standard.

    \*      \*      \*

The Petitioner alleges that one inducement to enter his second plea was that [trial counsel] erroneously advised that he might be sentenced to serve his sentence at 100%. That advice was never given. The parties announced during the second plea acceptance hearing that it was a condition of the Defendant's open plea that whatever sentence was imposed would be imposed at [thirty percent]. That was said again when the negotiated sentence was announced on May 16, 2014. What apparently happened was the [Petitioner] asked [trial counsel] what would happen if the judge set the sentence at [one-hundred percent] instead of the negotiated percentage of [thirty percent], and [trial counsel] said quite accurately that the Defendant could and should appeal such a decision.

The record supports the trial court's findings. Trial counsel's testimony at the post-conviction hearing does not reflect that he told Petitioner that Petitioner was required to receive the same sentence as his co-defendant. Trial counsel testified that he told Petitioner that the State was agreeable to a sentence that would be "something that's going to be in effect close to [fifteen] years." At the time, Petitioner's co-defendant had been sentenced to fifteen years at one-hundred percent. Petitioner agreed that the sentence of twenty-five years at thirty percent release eligibility was better than what his co-defendant had received at the time.

As for advice concerning release eligibility, Petitioner was already aware that he could not be sentenced at one-hundred percent release eligibility as his first guilty plea was set aside for that very reason. The post-conviction court obviously accredited trial counsel's testimony that the only way he would have told Petitioner that he could again be sentenced at one-hundred percent was if he and Petitioner had been talking about some kind of "weird hypothetical." Petitioner has not shown that trial counsel's performance was deficient or that he was prejudiced by any alleged deficiency concerning this issue. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
THOMAS T. WOODALL, PRESIDING JUDGE